## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **DEVON MD LLC** | **:  CIVIL ACTION** |
| | : |
| **v.** | **:  NO.  19-5378** |
| | : |
| **STEVEN F. DEMAIO, _et al._** | : |

## MEMORANDUM

**KEARNEY, J.**                                                              **December 19, 2019**

Pennsylvania businesses attempting to affix responsibility for disappointing expansion efforts in other states may justifiably attempt to sue parties outside of their home state. When a Pennsylvania business expands into other states, it may need to pursue the alleged responsible parties in their home state.  To pursue those out-of-state parties in this Court, the Pennsylvania business must establish our ability to constitutionally exercise personal jurisdiction over the out-of-state business relationships.  The Pennsylvanian must also plead claims which can proceed into discovery.  After carefully examining the pleadings and affidavits, we today find the Pennsylvania business sufficiently established a constitutional basis for our exercise of personal jurisdiction for the plead tort claims over two individual Connecticut citizens who traveled into this Commonwealth but not over an apparently non-existent Connecticut limited liability company. We also find the Pennsylvania business failed to plead fraud with the required specificity but may proceed on its diversion and interference tort claims.

### I.     Alleged facts

Pennsylvanian Devon MD LLC is a medical device manufacturer of "[d]eep [v]ein [t]hrombosis sleeves, crutches, splints, braces, and various orthotics."[1]  Devon alleges it formed a partnership in 2019 with two Connecticut residents—Steven DeMaio and James Nardella—after

"oral agreements reached in the Commonwealth of Pennsylvania" for Messrs. DeMaio and Nardella to market Devon's medical devices to orthopedic surgery practices in Connecticut.[2] This oral partnership hoped to form supply contracts with Connecticut orthopedic surgery practices who would prescribe Devon products to their patients.[3]

As we understand this business from Devon's complaint, if a medical practice under contract prescribed a Devon product to a patient, one of two billing companies—Dynamic Medical or USA Medical—would bill the patient's insurer for the product and then remit payment to the Partnership.[4] Devon had billing contracts with Dynamic Medical and USA Medical predating this Partnership.[5]

Devon incurred a series of expenses to assist the Partnership's marketing efforts in Connecticut. After Messrs. DeMaio and Nardella requested Connecticut office space to store supplies, Devon leased a space in Glastonbury, Connecticut for three years at an average $1,545.41 rent per month.[6] Mr. DeMaio signed the lease as Devon's "VP of Operations."[7] Devon spent $9,785.30 to furnish the Connecticut office space and hired a staffer to work in the office for $5,833.33 per month.[8]

### Devon's relationship with Glastonbury Surgery Center.

In May 2019, Devon contracted with Glastonbury Surgery Center in Glastonbury, Connecticut for the Partnership to inventory Devon medical equipment, including supplying Devon's deep vein thrombosis sleeves.[9] Devon's Chief Executive Officer John A. Bennett, MD signed the contract for Devon; Glastonbury Surgery's Medical Director, Christopher Lena, MD, signed for Glastonbury Surgery.[10] The contract recites "Devon is in the business of providing durable medical equipment including portable sequential [deep vein thrombosis] sleeves, crutches, splints, braces and various orthotics and related supplies ('Inventory')," and "Devon agrees to

2

place Inventory and purchased products with [Glastonbury Surgery Center]."[11] The parties could end the contract with ninety days notice.[12]

Devon claims at "Messrs. DeMaio and Nardella's request," it provided inventory for "Glastonbury's Orthopedic Surgeon[s] and/or the [Partnership] office . . . for billing to" Dynamic Medical or USA Medical.[13] Devon claims it inventoried: "(a) Breg Units; (b) 270 Devon-24 Units; (c) 800 Cold Therapy Units [and] 1,300 Sleeves; and (d) 200 Devon 24D 3-chambers sleeves."[14] Devon also claims it "made expenditures to develop High-End Cold Therapy Units for the Defendants, [Messrs.] DeMaio and Nardella to market for [the Partnership]."[15]

Devon alleges around July 2019 "upon information and belief . . . Defendants [Messrs.] DeMaio and Nardella . . . registered their own separate entity, Defendant Alledran [Medical], LLC and diverted payments from USA Medical … [to the] Alledran [Medical], LLC entity."[16]

### *Glastonbury terminates contract.*

On August 8, 2019, Dr. Lena terminated Glastonbury Surgery Center's supply contract with Devon by letter to CEO Bennett on letterhead of "Orthopedic Associates of Hartford, P.C."[17] Devon reasons "upon information and belief," because Dr. Lena did not send the letter on Glastonbury Surgery Center letterhead, "[Messrs.] DeMaio and/or Nardella requested Dr. Lena to write [this] letter purporting to immediately cancel the Glastonbury Surgery Center's May 16, 2019 Contract with [the Partnership], . . . to divert its business as well from [Devon] and the [Partnership]."[18] Devon alleges the earliest "any Glastonbury [Surgery Center] cancellation could have been effective [would have been] November 8, 2019" because of a ninety-day termination provision in the contract.[19]

Devon and Messrs. "DeMaio and/or Nardella jointly projected the [Partnership] would have revenues of $100,000 per month in insurance reimbursements in the first year . . .; $200,000

3

per month in [Partnership] year two; and $300,000 per month in year three."[20] Messrs. DeMaio and Nardella "collect[ed] some $200,000 in insurance payments that would otherwise have gone to the [Partnership] for July 2019 when [the Partnership] provided Durable Medical Devices to Glastonbury Surgery Center."[21]

Devon also alleges it "would have had a total of an additional $325,000 in insurance company benefit revenues for August, September, October and early November 2019" if Glastonbury Surgery did not terminate the contract without the required ninety-day notice. Devon claims "a total of $525,000 in lost revenue to the [Partnership] and to [Devon] from July 1 through November 8, 2019."[22]

Devon now sues Messrs. DeMaio and Nardella and Alledran Medical LLC in tort for: (1) diversion of Partnership business opportunity; (2) interference with Devon and Partnership's prospective economic advantage; and, (3) fraud. Devon pleads the diversion as:

- "[I]mplicit in their [Partnership], Defendants DeMaio and Nardella agreed to expend substantially all their work efforts in the marketing of Durbale Medical Devices only for their [Partnership] with [Devon]."[23]

- "Included in Defendants DeMaio [and] Nardella's duties to [Devon] and their [Partnership] was the solicitation of new Durable Medical Devices sales for their [Partnership] with Plaintiff, as well as the maintenance and furtherance of then-current sales business for the [Partnership]."[24]

- "Defendants DeMaio and Nardella, while enjoying the [Devon]-provided assets and resources, upon information and belief began to divert sales from the [Partnership's] customers for the benefit of their own entity Alledran, LLC to compete with their [Partnership] with [Devon]."[25]

Devon pleads interference as:

- Devon and Glastonbury Surgery Center "entered in to (sic) a Product Inventory Agreement for Plaintiff to supply Durable Medical Equipment to Glastonbury Surgery Center and its orthopedic patients."[26]

- Devon and Messrs. DeMaio and Nardella "projected that Glastonbury Surgical and ancillary arrangements with their orthopedic surgeons to whom Plaintiff

4

was marketing for the [Partnership] would produce some $6.2 in revenues over the following three (3) years."[27]

- Messrs. DeMaio and Nardella "were, as partners in the [Partnership], obligated to their partner (Plaintiff) to act, as to that Glastonbury Surgical contract, solely in the best interest of the [Partnership]."[28]

- Messrs. DeMaio and Nardella "registered their own competitive entity, Alledran, LLC, at the same office Plaintiff had rented for the [Partnership]."[29]

- "Defendants had Glastonbury Surgery's Medical Director purport to terminate the contract so it was to have Glastonbury Surgery's business go to Defendants DeMaio and Nardella's competing Alledran entity instead of to the [Partnership] including Plaintiff." •

Devon pleads fraud as:

- "Upon information and belief, on or before July 24, 2019, Defendants DeMaio and Nardella had registered their own separate entity, Defendant Alledran, LLC and diverted payments from USA Medical . . . to Defendants DeMaio and Nardella's Alledran, LLC entity."[30]

- "Defendants' conduct as set forth with particularity in preceding paragraphs, particularity in light of the expenditures Plaintiff made to fund the [Partnership] constitute Defendants DeMaio and Nardella's fraud on Plaintiff, and/or their [Partnership] to which they owed a duty of good faith having secured those investments from Plaintiff in the [Partnership], before diverting the Glastonbury Surgical (sic) and other business opportunities and prospects they marketed to for the [Partnership], and doing that diversion without Plaintiff's consent, to Defendants' Alledran, LLC."[31]

## II. Analysis

Defendants now move to dismiss.[32]  Defendants first argue we lack personal jurisdiction over each of them based on affidavits disavowing contacts to Pennsylvania.    Defendants then argue, assuming jurisdiction, Devon fails to state a claim for diversion, interference, or fraud. Mr. Nardella and Alledran Medical LLC also move to dismiss for insufficient service of process.

We agree we do not presently have sufficient evidence to exercise personal jurisdiction over Alledran Medical LLC for the plead tort claims.    We may exercise specific personal jurisdiction over Messrs. DeMaio and Nardella.    Devon states a claim for diversion and

interference at this preliminary stage against Messrs. DeMaio and Nardella but fails to plead a claim for fraud with particularity. Service is now proper as to Mr. Nardella.

## A.    We review Messrs. DeMaio's and Nardella's affidavits regarding specific jurisdiction.

DeMaio and Nardella submit detailed factual declarations to demonstrate we lack jurisdiction. According to these affidavits, one of Mr. DeMaio's New England based colleagues in the medical device field, Jason Bazemore, introduced Mr. DeMaio to the deep vein thrombosis sleeve medical device in October 2018.[33] Mr. DeMaio believed the deep vein thrombosis sleeve, a device designed to be placed on a patient's extremity following orthopedic surgery to reduce the risk of deep vein thrombosis, had significant growth prospects.[34] Several weeks after Mr. Bazemore introduced Mr. DeMaio to the concept, Devon's CEO Dr. John Bennett contacted Mr. Bazemore through LinkedIn about his company's efforts to manufacture a deep vein thrombosis sleeve.[35] Mr. Bazemore arranged a phone call between himself, Mr. DeMaio, and CEO Bennett.[36] On the call, CEO Bennett discussed the possibility of partnering with Mr. DeMaio to sell deep vein thrombosis sleeves in the Connecticut orthopedic market.[37] Mr. DeMaio participated in this call from Connecticut.[38]

Mr. DeMaio raised this prospect to a business partner, James Nardella.[39] Messrs. DeMaio and Nardella had previously worked "on a number of informal initiatives to provide orthopedic surgeons in central Connecticut (namely Hartford and Glastonbury) with a variety of medical devices."[40] For this project, Messrs. DeMaio and Nardella "attempted to attract interest in the use of these [deep vein thrombosis] [s]leeves by orthopedic surgeons, without success."[41]

Messrs. DeMaio and Nardella then entered into "an informal relationship with Vanguard Medical, a small durable medical device company in Connecticut" to continue to explore the market for deep vein thrombosis sleeves in central Connecticut.[42] These efforts succeeded as

6

Vanguard began purchasing deep vein thrombosis sleeves from Devon.[43] Vanguard employees, in partnership with Messrs. DeMaio and Nardella, would deliver the deep vein thrombosis sleeves to prescribed patients and instruct patients on how to use the sleeve.[44] Messrs. DeMaio and Nardella ended their relationship with Vanguard in April 2019.[45]

Mr. DeMaio then called CEO Bennett, telling him that he and Mr. Nardella "were parting ways with Vanguard."[46] The two then discussed "potential strategies to replace Vanguard in the distribution of [deep vein thrombosis] [s]leeves in the central Connecticut market."[47] Mr. DeMaio claims, for a partnership to work, he "advised [CEO] Bennett that [he and Mr. Nardella] would need a supplier of sleeves, and financial support to fund operations" and he and Mr. Nardella "would be interested in moving forward with the concept if [they] could obtain 50% of revenue, with all costs borne by others."[48]

On April 13, 2019, CEO Bennett invited Messrs. DeMaio and Nardella to a business meeting at his home in Villanova, Pennsylvania.[49] Messrs. DeMaio and Nardella drove down together and arrived at around 4:00 pm.[50] The next morning, Messrs. DeMaio and Nardella outlined their requests for a deal—Devon would need to supply the sleeves, pay for all operation costs and salaries, and split profits—and requested "a written agreement to set forth the final agreement."[51] According to Mr. DeMaio, "[CEO] Bennett indicated that he was agreeable to the concept in principle, and to the creation of a written agreement to memorialize [the] agreement, however, none was ever created."[52]

After the meeting at CEO Bennett's Villanova home, Messrs. DeMaio and Nardella returned to Connecticut to market Devon's deep vein thrombosis sleeves.[53] Mr. DeMaio arranged the lease of an office space and, on CEO Bennett's alleged instruction, signed the lease as "VP of Operations."[54]

7

Mr. DeMaio swears he and Mr. Nardella just a few weeks later in early May "had grown increasingly concerned with the lack of a definitive agreement with [CEO] Bennett, and relayed this concern to [CEO] Bennett, who again invited" Messrs. DeMaio and Nardella to his home in Villanova, Pennsylvania for a meeting.[55] During this second Pennsylvania visit, Messrs. DeMaio and Nardella visited Devon's King of Prussia, Pennsylvania office with two staff members "to discuss marketing materials for use in the central Connecticut market."[56] Later in the day, Messrs. DeMaio and Nardella asked CEO Bennett to reduce a final agreement to writing, which CEO Bennett said he would review but allegedly never signed.[57]

With Messrs. DeMaio and Nardella still in Pennsylvania, CEO Bennett "insisted" Messrs. DeMaio and Nardella "assist in obtaining what is commonly referred to as a 'stock and bill' contract between Glastonbury Surgery Center LLC and [Devon]."[58]  While Devon admits a Product Inventory Agreement between Glastonbury and Devon, Mr. DeMaio swears the Devon and Glastonbury Surgery Center contract "was never implemented in anyway (sic) by either party" and the contract "has nothing to do with the provision of [deep vein thrombosis] [s]leeves and cooling devices to orthopedic patients in central Connecticut, which was the focus of the concept talks with [CEO] Bennett."[59]

On June 2, 2019, Mr. DeMaio travelled back to Pennsylvania to inquire about a written Partnership agreement but again returned to Connecticut without one.[60]  Messrs. DeMaio and Nardella continued attempts to sell deep vein thrombosis sleeves even without a written agreement.[61] But around this time, Mr. DeMaio swears the "[deep vein thrombosis] [s]leeves that were being provided by [Devon], manufactured in China, were experiencing very high failure rates, much to the chagrin of the prescribing orthopedic surgeons."[62]  Mr. DeMaio also swears "[w]hen [Messrs. DeMaio and Nardella] confronted [CEO] Bennett with these complaints, the

8

relationship ... swiftly deteriorated."[63] In July 2019, Messrs. DeMaio and Nardella "discontinued the use of [deep vein thrombosis] [s]leeves."[64] Mr. DeMaio swears he "never received any monies whatsoever from or on account of Plaintiff or Bennett."[65]

Messrs. DeMaio and Nardella then joined as members to (non-party) Alledran Med, LLC, an entity Mr. Nardella swears he formed in 2017.[66] Alledran Med, LLC is different than (Defendant) Alledran Medical, LLC. Alledran Medical is an entity Mr. Nardella swears he took "steps to reserve . . . with the Connecticut Department of State" last summer but the "entity has never been formed, has no members, has never operated, and has no registered address."[67] Defendants attach a Connecticut Department of State "Business Inquiry" confirming Alledran Medical, LLC has no registered address.[68]

Messrs. DeMaio and Nardella swear they are domiciled and citizens of Connecticut.[69] Neither ever resided in Pennsylvania, nor do they own Pennsylvania real estate.[70] They do not maintain bank accounts in Pennsylvania.[71] They have no personal or business connections with Pennsylvania except for their relationship with Devon.[72]

## B. We may exercise specific personal jurisdiction over Messrs. DeMaio and Nardella for intentional tort claims but have no jurisdiction over Alledran Medical LLC.

Relying on their sworn affidavits, each Defendant moves to dismiss arguing we lack personal jurisdiction over them. Messrs. DeMaio and Nardella assert they reside and work in Connecticut and have no systemic or continuous contacts with Pennsylvania. Alledran Medical LLC asserts, while registered by name as a limited liability company in Connecticut, it has never been formed as an entity let alone established contacts with Pennsylvania. Devon responds by citing Messrs. DeMaio and Nardella's "significant contact" with Pennsylvania included in Messrs. DeMaio and Nardella's affidavits.

9

To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff has the burden of establishing our jurisdiction over the moving defendants.[73] When the parties do not request an evidentiary hearing on the motion to dismiss, the "plaintiff need only establish a prima facie case of personal jurisdiction and the plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor."[74]

We "may only assert personal jurisdiction over non-resident defendants to the extent permissible under the law of the state where the district court sits."[75] Pennsylvania's long arm statute authorizes courts to exercise personal jurisdiction "to the fullest extent allowed under the Constitution of the United States and may be based on the most minimum contact with this Commonwealth allowed under the Constitution of the United States."[76] The Due Process Clause of the Constitution requires a defendant have "minimum contacts" in the forum state, and that the exercise of jurisdiction comport with "traditional notions of fair play and substantial justice."[77] The plaintiff must show that the defendant has "purposefully directed its activities toward the residents" of Pennsylvania or otherwise "purposefully availed itself of the privilege of conducting activities within [Pennsylvania], thus invoking the benefits and protections of its laws."[78]

These due process principles give rise to two recognized types of personal jurisdiction: general jurisdiction and specific jurisdiction.[79] General jurisdiction depends on the defendant's "continuous and systematic" contacts with the forum, and exists even if the cause of action is unrelated to the defendant's activities in the forum state.[80] Specific jurisdiction is appropriate only if the cause of action arises out of a defendant's forum-related activities, such that the defendant "should reasonably expect being haled into court" in that forum.[81]

10

## 1. We lack general jurisdiction.

Our exercise of general jurisdiction "depends on a defendant having maintained 'continuous and systematic' contacts with" Pennsylvania.[82] The Supreme Court requires the defendant be "at home" in this forum.[83] Our Court of Appeals requires a plaintiff show "significantly more than mere minimum contacts" to establish general jurisdiction; the nonresident defendant's contacts with the forum must be continuous and substantial.[84]

Defendants submit affidavits disavowing continuous and substantial contacts with Pennsylvania. Messrs. DeMaio and Nardella swear they both reside in Connecticut and do not own real estate or maintain any bank accounts in Pennsylvania. Mr. Nardella swears Defendant Alledran Medical LLC "has never been formed, has no members, has never operated, and has no registered address."[85]

While Alledran Medical does not have significant contacts with Pennsylvania permitting a finding of general jurisdiction, both Messrs. DeMaio and Nardella admit they engaged in business dealings with CEO Bennett and Devon in Pennsylvania. But for these business dealings to be sufficiently continuous and substantial for general jurisdiction, we must consider:

> [1] whether the defendant[s] conduct[] 'daily business' with Pennsylvania companies ... [2] what percentage of defendant[s'] total business was generated in Pennsylvania ... [3] whether defendant[s] maintained offices or paid taxes in Pennsylvania ... [4] whether defendant[s] availed [themselves] of Pennsylvania resources in an extensive manner as a way of furthering its business ... [5] whether defendant[s] made significant direct sales in Pennsylvania, solicited business regularly in Pennsylvania, and advertised in a manner specifically targeted to reach the Pennsylvania market.[86]

All of Messrs. DeMaio and Nardella's alleged contacts with Pennsylvania stem from business dealings with CEO Bennett and Devon from 2018 to 2019. Messrs. DeMaio and Nardella conducted regular business *for* Devon during this time by aiming to sell Devon's products in

11

central Connecticut. But Messrs. DeMaio and Nardella never conducted daily business *with* a Pennsylvania company during this time, not even with Devon. According to the submitted affidavits, Messrs. DeMaio and Nardella only sporadically met with CEO Bennett in Pennsylvania. Messrs. DeMaio and Nardella "have no personal or business connections with Pennsylvania, beyond the limited instances related to this matter" and did not make sales in Pennsylvania.[87] While CEO Bennett leased office space in Connecticut to assist Messrs. DeMaio and Nardella's sales efforts of Devon products, the two did not avail themselves of extensive Pennsylvania resources. Messrs. DeMaio and Nardella did not maintain an office or office space in Pennsylvania, nor did they advertise in Pennsylvania. We cannot find general jurisdiction over these two Connecticut residents for briefly attempting to develop business in central Connecticut for a Pennsylvania company. No Defendant is "at home" in Pennsylvania.

### 2. We may exercise specific jurisdiction for the tort claims over Messrs. DeMaio and Nardella but not over Alledran Medical LLC.

Specific jurisdiction (or claim-specific jurisdiction) exists when the defendant's conduct giving rise to the cause of action "create[s] a substantial connection with the forum State."[88] In *O'Connor v. Sandy Lane Hotel Co.*, our Court of Appeals announced the "traditional test" for specific jurisdiction and referred to *Calder*'s "effects test" as "a slightly refined version" of the traditional test applied to intentional torts.[89] When we are asked to review specific personal jurisdiction over a negligence or related claim, we only apply the traditional test.[90] If we are asked to consider specific personal over intentional torts, we first apply the traditional test and, if we do not find jurisdiction under the traditional test, we then consider the *Calder* effects test.[91]

Devon asserts three intentional torts—(1) diversion of partnership business opportunity; (2) interference with Devon and Partnership prospective economic advantage; and, (3) fraud.[92] While we must assess whether specific jurisdiction lies under the traditional test and possibly the

12

*Calder* effects test, we need not conduct a separate jurisdictional analysis for each intentional tort.[93]  Each tort is based on the same or similar allegations: after Devon and Messrs. DeMaio and Nardella formed a Partnership in Pennsylvania, Messrs. DeMaio and Nardella took Partnership insurance reimbursements for themselves, requested a Partnership client to terminate a supply contract, and started their own LLC to conduct business with the Partnership's client and other Connecticut orthopedic practices without notice to the Partnership.  As these claims are based on the same facts—or contacts—we simply review if the alleged contracts support specific personal jurisdiction over the Defendants.

### i.     We may exercise traditional specific jurisdiction over the plead tort claims.

Our Court of Appeals directs a three-part inquiry for the traditional test of whether specific jurisdiction exists:

> First, the defendant must have "purposefully directed [its] activities" at the forum. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985). Second, the litigation must "arise out of or relate to" at least one of those activities. *Helicopteros*, 466 U.S. at 414; *Grimes v. Vitalink Commc'ns Corp.*, 17 F.3d 1553, 1559 (3d Cir.1994). And third, if the prior two requirements are met, a court may consider whether the exercise of jurisdiction otherwise "comport[s] with 'fair play and substantial justice.'" *Burger King*, 471 U.S. at 476 (quoting *Int'l Shoe*, 326 U.S. at 320).[94]

For the first prong, a defendant must have "purposefully avail[ed] itself of the privilege of conducting activities within the forum."[95]  Although physical entrance into the forum is not required, there must be "deliberate targeting of the forum."[96]  "Unilateral activity of those who claim some relationship with a nonresident defendant" is not sufficient and contacts with a state's citizen taking place outside the forum are not purposeful contacts with the forum itself.[97]

The second prong requires litigation "arise out of or relate to" the defendant's "purposefully directed" forum activities.  Although it did not announce a specific rule for

determining the relatedness prong, the Court of Appeals in *O'Connor* directed our analysis "should hew closely to the reciprocity principle upon which specific jurisdiction rests"[98]:

> With each purposeful contact by an out-of-state resident, the forum state's laws will extend certain benefits and impose certain obligations. Specific jurisdiction is the cost of enjoying the benefits. The relatedness requirement's function is to maintain balance in this reciprocal exchange. In order to do so, it must keep the jurisdictional exposure that results from a contact closely tailored to that contact's accompanying substantive obligations. The causal connection can be somewhat looser than the tort concept of proximate causation . . . , but it must nonetheless be intimate enough to keep the quid pro quo proportional and personal jurisdiction reasonably foreseeable.[99]

The Court of Appeals explained its "relatedness analysis" does not require proximate cause or substantive relevance.[100]

If the plaintiff satisfies the first and second prongs of minimum contacts, then we must consider whether the exercise of jurisdiction comports with "traditional notices of fair play and substantial justice."[101] Jurisdiction is presumptively constitutional where minimum contacts exist, and the defendant "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable."[102] When "balancing jurisdictional reasonableness," the Supreme Court directs the consideration of "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate [and international] judicial system's interest in obtaining the most efficient resolution of controversies," and "[t]he procedural and substantive interests of other nations."[103]

We evaluate whether we have specific personal jurisdiction over Defendants for claims of diversion, interference, and fraud by looking to each defendant's contacts with Pennsylvania.[104]

We first determine whether there is specific jurisdiction over Defendants Messrs. DeMaio and Nardella by applying the *O'Connor* three-part test. We consider under step one whether Messrs. DeMaio and Nardella purposefully directed activities at Pennsylvania. As addressed

14

above, Mr. DeMaio first encountered CEO Bennett and Devon during a phone call around October 2018. Mr. DeMaio did not know CEO Bennett's location during the call but he, along with Mr. Nardella, began assisting a Connecticut company (Vanguard) distribute Devon's deep vein thrombosis sleeves in Connecticut. After Messrs. DeMaio and Nardella ended their relationship with Vanguard, Mr. DeMaio called CEO Bennett about a new arrangement. Messrs. DeMaio and Nardella drove to CEO Bennett's home in Villanova, Pennsylvania more than once to discuss a deal. As plead, Messrs. DeMaio and Nardella formed a Partnership with Devon during their visits to Pennsylvania. Devon leased office space in Connecticut. While Messrs. DeMaio and Nardella only sold Devon products in the central Connecticut market, Messrs. DeMaio and Nardella— through allegedly forming a partnership in Pennsylvania with a Pennsylvania company— purposefully directed activities at Pennsylvania.

We then consider if the litigation arises out of Messrs. DeMaio's and Nardella's activities in the forum. This case arises from alleged violations of a Partnership formed in Pennsylvania. While a Partnership's formation in Pennsylvania alone does not necessarily confer our jurisdiction for any claim involving the Partnership, we are guided by our Court of Appeals decision in *Miller Yacht Sales v. Smith* instructing to apply a "realistic approach to analyzing a defendant's contacts with a forum."[105]

Mr. DeMaio asserts, while he and Mr. Nardella visited CEO Bennett's Pennsylvania home, CEO Bennett "insisted" Messrs. DeMaio and Nardella "assist in obtaining what is commonly referred to as a 'stock and bill' contract between Glastonbury Surgery Center."[106] Devon and Glastonbury Surgery formed this contract in mid-May. Devon's claim now relates to interference with this contract as an alleged Partnership asset. Devon alleges Messrs. DeMaio and Nardella diverted reimbursement payments due from USA Medical billing to Mr. Nardella and eventually

requested Glastonbury Surgery to terminate the contract with Devon, which it did in August. Because this claim is based on allegedly violated obligations owed to a Partnership formed in Pennsylvania, and the alleged violations concern a business opportunity Defendants learned of while in Pennsylvania, there is specific personal jurisdiction over Messrs. DeMaio and Nardella.

Our holding this case arises out Messrs. DeMaio and Nardella's contacts with Pennsylvania is guided by our Court of Appeals' analysis in *Miller Yacht Sales*. In *Miller Yacht Sales*, our Court of Appeals applied the traditional specific jurisdiction analysis and found out of state residents' contacts with the New Jersey plaintiff sufficiently related to a tortious interference claim when: (1) the out of state residents visited the company's New Jersey office; (2) the out of state residents met with a Chinese company on behalf of the New Jersey company; and (3) after the meeting, the New Jersey company claimed the out of state residents engaged the Chinese company to misappropriate the New Jersey company's trade secrets.[107]

Three years after *Miller Yacht*, our Court of Appeals in *O'Connor* explained the relatedness requirement is met when "a meaningful link exists between a legal obligation that arose in the forum and the substance of the plaintiffs' claims."[108] Devon, at this early stage, sufficiently alleges a meaningful link between Messrs. DeMaio and Nardella's contacts with Pennsylvania forming legal obligations—the Partnership formed in Pennsylvania and alleged interference of a Connecticut client introduced in Pennsylvania—and the substance of their claims. While a close call, we find specific personal jurisdiction over Messrs. DeMaio and Nardella under the traditional test as exercising personal jurisdiction over Messrs. DeMaio and Nardella comports with notions of fair play and substantial justice.

Applying the traditional test for Alledran Medical LLC, we do not find specific jurisdiction. Mr. Nardella swears he registered the name Alledran Medical as a limited liability company in

16

Connecticut, but it has never been formed and has never operated. Plaintiff's lone allegation against Alledran is "[u]pon information and belief . . . Defendants [Messrs.] DeMaio and Nardella had registered their own separate entity, Defendant Alledran, LLC and diverted payments from USA Medical."[109] Based on this allegation and the submitted affidavits, we cannot say Alledran Medical deliberately targeted Pennsylvania. It did not purposefully direct any activities at Pennsylvania. The entity is registered in name only. There are no registered agents of the company. It is unclear how Alledran would even target or direct activities at Pennsylvania (or anywhere). There is no specific jurisdiction for this entity under the traditional test.

### ii. Devon also satisfies the *Calder* effects test to establish personal jurisdiction over Messrs. DeMaio and Nardella.

Failing to find specific personal jurisdiction over Alledran Medical under the traditional test, we must apply the *Calder* effects test.[110] For the sake of completeness, we also apply the *Calder* effects test to Messrs. DeMaio and Nardella despite already finding personal jurisdiction over them under the traditional test.

Under the *Calder* effects test, we may exercise jurisdiction if Devon shows: "(1) [t]he defendant committed an intentional tort; (2) [t]he plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort; [and] (3) [t]he defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity."[111]

Devon meets the first two elements of establishing specific personal jurisdiction against Defendants under the *Calder* test. Devon alleges Messrs. DeMaio and Nardella, and Alledran Medical committed diversion, interference, and fraud. Each claim is an intentional tort.[112] Devon also shows it suffered the alleged harm in Pennsylvania because Devon claims Defendants' conduct caused it monetary damages in Pennsylvania.

17

Whether the Defendants aimed alleged tortious conduct at the forum is a more difficult question. In *IMO Industries v. Kiekert AG*, our Court of Appeals described divergent views from other courts of appeals on whether the *Calder* effects test—created in the libel context—should apply narrowly or broadly in business tort cases.[113] Our Court of Appeals acknowledged "the majority of [its] sister circuits" narrowly applied *Calder* to business torts and, after review the two approaches, agreed with the narrow approach taken by the majority that "the mere allegation that the plaintiff feels the effect of the defendant's tortious conduct in the forum because the plaintiff is located there is insufficient to satisfy *Calder*."[114] By electing the narrow approach, our Court of Appeals in *IMO Industries* instructed: a resident plaintiff suing an out of state defendant under a business tort theory cannot simply allege the out of state defendant "targeted the forum" by harming a resident business.

In *IMO Industries*, the unanimous panel held a German company did not target New Jersey by allegedly interfering in a transaction between a French company (partially owned by the New Jersey company plaintiff) and an Italian company. Our Court of Appeals found the German company's letters to New York, phone calls into New Jersey, and meetings in Toronto and Germany relating to the French and Italian transaction did not meet the requisite contacts. Our Court of Appeals explained "New Jersey was not the focus of the dispute."[115]

Three years later in *Remick v. Manfredy*, our Court of Appeals again considered what is required to show a defendant aimed conduct at the forum.[116] In *Remick*, a lawyer represented a boxer until the boxer fired the lawyer and hired new counsel who sent the boxer's former lawyer a letter stating the boxer fired him because he failed to effectively negotiate fights for the boxer. The former lawyer sued the boxer for breach of contract and sued the boxer and his new counsel for tortious interference.

18

Our Court of Appeals found specific personal jurisdiction over the boxer on the breach of contract claim and then considered whether the District Court could exercise specific personal jurisdiction for the tortious interference claim. Judge Sloviter, writing for our Court of Appeals, noted "[a]lbeit a tort, [tortious interference] necessarily related to the contract which [the former lawyer] had entered into with [the boxer] and which is the subject of the alleged tortious interference."[117] The Court reasoned this situation was "unlike the case in *IMO Industries*" because the former lawyer based his law practice in Philadelphia and entered into the contract with the boxer while both were at his Philadelphia office thus the "alleged tortious conduct was expressly aimed at injuring [the former lawyer] in Pennsylvania where he lives and works."[118]

Since *IMO Industries* and *Remick*, the Supreme Court has revisited the *Calder* effects test in *Walden v. Fiore.* While it is unclear if *Walden* "limit[s] the *Calder* effects test,"[119] the Supreme Court instructed: "The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way."[120]

We consider whether Devon's alleged business torts connect Messrs. DeMaio and Nardella to Pennsylvania in a meaningful way so as to make Pennsylvania the focal point. Unlike *IMO Industries*, Messrs. DeMaio and Nardella physically entered the forum state on more than one occasion and are alleged to have formed a Partnership while personally visiting Pennsylvania. As in *Remick*, Messrs. DeMaio and Nardella negotiated the business relationship in Pennsylvania. During their second visit to Pennsylvania, CEO Bennett insisted Messrs. DeMaio and Nardella assist Devon land a stock and bill contract with Glastonbury Surgery. Devon now alleges Messrs. DeMaio and Nardella diverted payments from Glastonbury Surgery, interfered with Devon's contract and, in doing so, committed fraud. Like *Remick*, the core facts giving rise to these claims—the formation of the Partnership and the introduction to Glastonbury Surgery Center—

19

occurred in Pennsylvania. Of course, as instructed by *IMO Industries*, we recognize the alleged payment diversions, fraud, and contractual interference all occurred out of the forum. But the *Calder* test, and *Walden*'s gloss on *Calder*, instruct us to look to the "focal point" of the tort and to consider "meaningful connections" with the forum. As in *Remick*, because the torts are based on a relationship and contacts formed in Pennsylvania, at this early stage, Devon presents a prima facie showing Pennsylvania is the focal point of its allegations and Messrs. DeMaio and Nardella's conduct meaningfully connects them to Pennsylvania.

While we find specific personal jurisdiction as to Messrs. DeMaio and Nardella under the *Calder* effects test, we cannot find specific personal jurisdiction over Alledran Medical, LLC. Mr. Nardella swears in July 2019 he registered the name Alledran Medical as a limited liability company in Connecticut, but it has never been formed and never operated. Devon does not attempt to rebut this fact through its own affidavit. Without even functioning as a limited liability company, we cannot conclude Alledran aimed tortious conduct, or any conduct, at Pennsylvania (or any other forum).[121] We cannot exercise personal jurisdiction at this time over Alledran Medical LLC under the *Calder* effects test.[122]

## C.    Devon fails to plead fraud with particularity.

Messrs. DeMaio and Nardella move to dismiss Devon's fraud claim arguing Devon fails to plead this claim with particularity as required under Federal Rule of Civil Procedure 9. Devon responds it meets the particularity requirement and cites paragraph twenty-four of its complaint pleading Messrs. "DeMaio and Nardella . . . upon information and belief began to divert sales from the [Partnership's] customers for the benefit of their own entity Alledran [Medical], LLC to compete with their [Partnership] with Plaintiff."[123]

Rule 9(b) states "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."[124] The purposes of Rule 9(b) are to provide notice

of the precise misconduct with which defendants are charged and to "safeguard defendants against spurious charges of immoral and fraudulent behavior."[125] "As long as the allegations of fraud reflect precision and some measure of substantiation, the complaint is adequate."[126]

Devon does not establish the requisite precision or substantiation to proceed on a claim for fraud. Devon simply alleges Messrs. DeMaio and Nardella diverted payments from Partnership customers and from USA Medical. But Devon fails to allege how Messrs. DeMaio and Nardella committed this fraud. As for USA Medical, Devon alleges the Partnership "market[ed] a compliment of post-orthopedic surgery ancillary durable medical equipment to post-procedure patients of orthopedic patients for billing by . . . Dynamic Medical and USA Medical to [health insurers] of th[e] post-orthopedic surgery patients."[127] Devon does not allege Messrs. DeMaio or Nardella ever received payments from USA Medical, nor do they identify the other customers who allegedly paid Messrs. DeMaio or Nardella. Devon currently fails to allege the requisite specificity to state a claim for fraud against Messrs. DeMaio and Nardella.

## D. Devon may proceed against Messrs. DeMaio and Nardella for diversion and interference.

Messrs. DeMaio and Nardella argue Devon fails to state a claim for diversion of business opportunity or interference with the Partnership's prospective economic advantage because both of these claims rest on pleading a partnership and Devon fails to sufficiently plead the existence of a partnership or partnership agreement. Devon responds it pleads the "existence of the partnership, details of the partnership, and the termination of that partnership."[128]

In Pennsylvania, "the association of two or more persons to carry on as co-owners a business for profit forms a partnership, whether or not the persons intend to form a partnership."[129] Devon asserts Messrs. DeMaio and Nardella "did business in the Commonwealth of Pennsylvania by a series of acts for purpose of realizing a pecuniary benefit in forming their marketing

21

partnership."[130] Devon claims "[t]here was, until July 24, 2019, a partnership of [Devon] and Defendants DeMaio and Nardella pursuant to oral agreements reached in the Commonwealth of Pennsylvania to market a compliment of post-orthopedic surgery [devices]."[131] Throughout the Complaint, Devon alleges various duties held by Messrs. DeMaio and Nardella as Devon's partners. At this preliminary stage, taking these allegations as true, Devon plausibly pleads an oral partnership between Devon and Messrs. DeMaio and Nardella and may proceed on diversion and interference claims based on this Partnership.

### E.    Devon cured insufficient service of Mr. Nardella under Rule 4.

Mr. Nardella moves under Federal Rule of Civil Procedure 12(b)(5) for dismissal of Devon's Complaint for insufficient service of process. Mr. Nardella argues Devon sent the Complaint to his father's residence and therefore service did not comply with Federal Rule of Civil Procedure 4. Devon admits it sent the Complaint to Mr. Nardella's father and has since cured defective service by sending a copy of the Complaint to Mr. Nardella's Connecticut home. When service is cured after a Rule 12(b)(5) motion is filed, we generally deny the motion.[132] We find Devon cured service to Mr. Nardella. We deny Mr. Nardella's motion.

### III.   Conclusion

We have no evidence today allowing us to exercise personal jurisdiction over Alledran Medical LLC. We may exercise personal jurisdiction over Messrs. DeMaio and Nardella under the traditional and *Calder* effects test. Devon fails to plead a claim for fraud with specificity but sufficiently pleads the existence of a Partnership with Messrs. DeMaio and Nardella to proceed on claims of diversion and interference. We find Devon cured service as to Mr. Nardella.

---

[1] ECF Doc. No 1 at p. 11 of 34, ¶ 11.

[2] *Id.* at p. 10 of 34, ¶ 7.

[3] *Id.* at ¶ 8.

[4] *Id.* at ¶ 7.

[5] *Id.* at ¶ 8.

[6] *Id.* at pp. 18-20 of 34.

[7] *Id.*

[8] *Id.* at p. 11 of 34, ¶ 10.

[9] *Id.* at ¶ 11.

[10] *Id.* at pp. 25-32 of 34.

[11] *Id.* at p. 26 of 34.

[12] Id. at p. 13 of 34, ¶ 16.

[13] *Id.* at p. 11 of 34, ¶ 12.

[14] *Id.*

[15] *Id.* at ¶ 13.

[16] *Id.* at ¶ 15.

[17] *Id.* at pp. 12-13 of 34, ¶ 16.

[18] *Id.*

[19] *Id.* at p. 13 of 34, ¶ 16.

[20] *Id.* at ¶ 18.

[21] *Id.* at ¶ 17.

[22] *Id.* at ¶ 19. We are unclear as to whether Devon seeks these revenues for itself or the Partnership. We do not understand how Devon could collect revenues allegedly due the Partnership.

[23] *Id.* at ¶ 21.

[24] *Id.* at p. 14 of 34, ¶ 22.

[25] *Id.* at ¶ 25.

[26] *Id.* at ¶ 28.

23

[27] *Id.* at p. 15 of 34, ¶ 29.

[28] *Id.* at ¶ 30.

[29] *Id.* at ¶ 31.

[30] *Id.* at p. 12 of 34, ¶ 15.

[31] *Id.* at p. 16 of 34, ¶ 36.

[32] When considering a motion to dismiss "[w]e accept as true all allegations in the plaintiff's complaint as well as all reasonable inferences that can be drawn from them, and we construe them in a light most favorable to the non-movant." *Tatis v. Allied Interstate, LLC*, 882 F.3d 422, 426 (3d Cir. 2018) (quoting *Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 262 n.27 (3d Cir. 2010)). To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Our Court of Appeals requires us to apply a three-step analysis under a 12(b)(6) motion: (1) "it must 'tak[e] note of the elements [the] plaintiff must plead to state a claim;'" (2) "it should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth;'" and, (3) "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 675, 679). "Unlike a 12(b)(6) motion, in resolving 12(b)(2) motions, the Court may consider affidavits submitted by the parties." *Globus Med., Inc. v. Vortex Spine, LLC*, No. 14-3105, 2015 WL 3456753, at *1 (E.D. Pa. May 29, 2015) (citing *Patterson by Paterson v. FBI*, 893 F.2d 595, 603–04 (3d Cir. 1990)).

[33] ECF Doc. No. 4-2 (DeMaio Aff.) at ¶ 11, ¶¶ 10-11.

[34] *Id.* at ¶ 11.

[35] *Id.* at ¶ 14.

[36] *Id.*

[37] *Id.* at ¶ 15.

[38] *Id.*

[39] *Id.* at ¶ 9.

[40] *Id.*

[41] *Id.* at ¶ 16.

[42] *Id.* at ¶ 17.

24

[43] *Id.* at ¶¶ 17-18.

[44] *Id.* at ¶ 19.

[45] *Id.* at ¶ 21.

[46] *Id.* at ¶ 22.

[47] *Id.*

[48] *Id.*

[49] *Id.* at ¶ 23.

[50] *Id.*

[51] *Id.* at ¶ 24.

[52] *Id.* at ¶ 25.

[53] *Id.* at ¶ 26.

[54] *Id.* at ¶¶ 27-28.

[55] *Id.* at ¶ 29.

[56] *Id.*

[57] *Id.* at ¶¶ 29-30.

[58] *Id.* at ¶ 30.

[59] *Id.* at ¶ 31.

[60] *Id.* at ¶ 32.

[61] *Id.* at ¶ 33.

[62] *Id.*

[63] *Id.* at ¶ 34.

[64] *Id.*

[65] *Id.* at ¶ 28.

[66] ECF Doc. No. 4-3 (Nardella Aff.) at p. 3.

[67] *Id.*

[68] *Id.* at p. 7.

[69] ECF Doc. No. 4-2 (DeMaio Aff.) at ¶ 1; ECF Doc. No. 4-3 (Nardella Aff.) at p. 1.

[70] ECF Doc. No. 4-2 (DeMaio Aff.) at ¶¶ 3-4; ECF Doc. No. 4-3 (Nardella Aff.) at p. 1.

[71] ECF Doc. No. 4-2 (DeMaio Aff.) at ¶ 5; ECF Doc. No. 4-3 (Nardella Aff.) at p. 1.

[72] ECF Doc. No. 4-2 (DeMaio Aff.) at ¶ 6; ECF Doc. No. 4-3 (Nardella Aff.) at p. 1.

[73] *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002).

[74] *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004) (citing *Pinker*, 292 F.3d at 368).

[75] *Ratcliff v. Best Buy Stores*, No. 15-4192, 2016 WL 7228732, at *1 (E.D. Pa. June 24, 2016).

[76] 42 Pa. Cons. Stat. § 5322(b).

[77] *Remick v. Manfredy*, 238 F.3d 248, 255 (3d Cir.2001) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

[78] *Id.* (internal citations omitted).

[79] *Marten v. Godwin*, 499 F.3d 290, 296 (3d Cir. 2007).

[80] *Remick v. Manfredy*, 238 F.3d at 255 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984)).

[81] *Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prod. Co.*, 75 F.3d 147, 151 (3d Cir. 1996) (quoting *Worldwide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

[82] *D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 108 (3d Cir. 2009).

[83] "As we have since explained, "[a] court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014).

[84] *Reliance Steel Prod. Co. v. Watson, Ess, Marshall & Engass*, 675 F.2d 587, 589 (3d Cir. 1987) (finding only contacts that are "extensive and persuasive" suffice).

[85] ECF Doc. No. 4-3.

[86] *Henning v. Suarez Corp.*, 713 F.Supp.2d 459, 465 (E.D.Pa. 2010).

[87] ECF Doc. No. 4-2 (DeMaio Aff.) at ¶ 6; ECF Doc. No. 4-3 (Nardella Aff.) at p. 1.

[88] *Walden v. Fiore*, 571 U.S. 277, 284 (2014).

[89] *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 317 (3d Cir. 2007); *id.* at 317 n.2.

[90] *See generally id.*

[91] *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 259-60 (3d Cir. 1998) (applying traditional test in intentional business tort case before applying *Calder* effects test); *Numeric Analytics, LLC v. McCabe*, 161 F.Supp.3d 348, 349 (E.D. Pa. 2016) ("When evaluating specific personal jurisdiction over intentional torts, courts first apply the traditional test described above. If jurisdiction cannot be satisfied under the traditional test, courts apply an analysis known as the *Calder* Effects Test.").

[92] *IMO Indus.,* 155 F.3d at 262 (noting business torts are intentional torts).

[93] *Remick v. Manfredy*, 238 F.3d 248 (3d. Cir. 2001) ("[T]he District Court did not conduct a claim-specific analysis except as to the breach of contract claim. It may not be necessary to do so in every multiple claim case . . . .").

[94] *O'Connor*, 496 F.3d at 317 (duplicative reporter citations omitted).

[95] *Id.* (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).

[96] *Id.*

[97] *Id.*

[98] *Id.* at 323 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475-76 (1985)).

[99] *Id.* (internal citations omitted).

[100] *Id.* at 324.

[101] *Id.* at 323 (citing *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945)).

[102] *Id.* (citing *Burger King*, 471 U.S. at 477).

[103] *Id.* (citing *Burger King*, 471 U.S. at 477; *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 113 (1987)).

[104] *Remick v. Manfredy*, 238 F.3d 248 (3d. Cir. 2001).

[105] *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 100 (3d Cir. 2004).

[106] ECF Doc. No. 4-2 at ¶ 30. Mr. DeMaio asserts the "stock and bill contract literally has nothing to do with the provision of [deep vein thrombosis] [s]leeves and cooling devices to orthopedic

patients in central Connecticut, which was the focus of our concept talks with Bennet." *Id.* at ¶ 31. But Devon's complaint alleges the contract between Devon and Glastonbury Surgery involved Partnership business. We must defer to plaintiff's allegations at this stage. *See Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004) (citing *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002)).

[107] *Miller Yacht Sales*, 384 F.3d at 100.

[108] *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 324 (3d Cir. 2007).

[109] ECF Doc. No. 1 at p. 12 of 34, at ¶ 15.

[110] *Numeric Analytics, LLC v. McCabe*, 161 F.Supp.3d 348, 349 (E.D. Pa. 2016).

[111] *Marten v. Godwin*, 499 F.3d 290, 297 (3d Cir. 2007) (citing *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 265-66 (3d Cir. 1998)).

[112] *Remick v. Manfredy*, 238 F.3d 248, 256-60 (3d. Cir. 2001).

[113] *IMO Indus.*, 155 F.3d at 260-65.

[114] *Id.* at 263.

[115] *Id.* at 268.

[116] *Remick v. Manfredy*, 238 F.3d 248, 260 (3d. Cir. 2001).

[117] *Id.* at 260.

[118] *Id.*

[119] *See Streamline Business Servs. V. Vidible, Inc.*, No. 14-1433, 2014 WL 4209550, at \*12 (E.D. Pa. Aug. 26, 2014).

[120] *Walden v. Fiore*, 571 U.S. 277, 290 (2014).

[121] As we do not find personal jurisdiction over Alledran Medical, LLC, we do not rule on its motions under Federal Rules of Civil Procedure 12(b)(5) or 12(b)(6).

[122] On December 18, 2019, Devon requested jurisdictional discovery as to Alledran Medical. In our accompanying Order, we grant Devon additional time to establish our jurisdiction over this entity.

[123] ECF Doc. No. 7 at p. 18. Devon also cites to paragraphs twenty-five and thirty-four of its Complaint, but allegations in these paragraphs are also without the requisite specificity.

[124] Fed. R. Civ. P. 9(b).

[125] *Seville Indus. Mach. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir.1984).

[126] *In re Meridian Sec. Litig.*, 772 F.Supp. 223, 226 (E.D. Pa.1991) (citing *Seville*, 742 F.2d at 791)).

[127] ECF Doc. No. 1 at p. 10 of 34, ¶ 7.

[128] ECF Doc. No. 7 at p. 19.

[129] 15 Pa. Stat. and Cons. Stat. Ann. § 8422 (West).

[130] ECF Doc. No. 1 at p. 9 of 34, ¶ 5.

[131] *Id.* at p. 10 of 34, ¶ 5.

[132] *Pennington v. Wells Fargo Bank, N.A.*, No. 11-2896, 2012 WL 5199257, at *2 (E.D. Pa. Oct. 19, 2012) ("On May 21, 2012, I denied Wells Fargo's motion to dismiss based on Rule 12(b)(5) because the Penningtons cured their insufficient service of process.").